IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GELBER GROUP, LLC<br><br>Plaintiff,<br><br>v.<br><br>JUNG (JACOB) YUP LEE,<br><br>Defendant. | Case No. 1:25-cv-15267 |

## COMPLAINT

Plaintiff Gelber Group, LLC ("Gelber"), for its Complaint against Defendant Jung (Jacob) Yup Lee ("Lee"), states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Gelber is a limited liability company organized under the laws of the State of Delaware. None of the members of Gelber are citizens of Massachusetts. Gelber's principal place of business is 350 North Orleans St., S10000, Chicago, Illinois 60654.

2. Lee is a citizen of Massachusetts believed to reside at 301 Guest St., Apt. 326, Boston, Massachusetts 02134.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because Gelber's claims arise under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq.*, and Gelber's other claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

5. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## RELEVANT FACTUAL BACKGROUND

6. Founded in 1982, Gelber is a leading proprietary trading firm with offices in Chicago, Illinois and White Plains, New York. Gelber trades across major asset classes using proprietary resources, including, but not limited to, a number of algorithmic trading strategies ("ATS").

7. Gelber hires both experienced traders and individuals with limited experience in trading, who Gelber invests significant time and energy training to become productive and profitable traders.

8. Gelber also maintains and provides traders with access to its Confidential Information, including its ATS, which traders use to execute trades across various asset classes on behalf of Gelber.

9. The training that Gelber provides, the Confidential Information belonging to Gelber, and its substantial expenditures in researching, updating, and maintaining its ATS enables Gelber to produce substantial profits through its execution of trades on various trading venues.

10. As discussed in further detail below, Lee worked as a Quantitative Trader for Gelber, and Gelber provided Lee with substantial training regarding its trading strategies, its use and development of a Gelber ATS known as Meld, and access to certain Gelber Confidential Information.

*Lee's Employment with Gelber*

11. On August 11, 2022, Gelber extended a job offer to Lee as a Quantitative Trader, working from Gelber's Chicago, Illinois office with Gelber's Meld team, overseen by a trading

manager named Jeffrey Grossman. Lee began working at Gelber in September 2022. Prior to becoming employed by Gelber, Lee had relatively limited work experience in the trading industry.

12. The Meld ATS was developed by Grossman, who has worked at Gelber since 2009. The Confidential Information underlying Meld has been in continuous production usage at Gelber for more than fifteen years. Gelber spent significant resources in researching, developing, testing and improving Meld long before Gelber employed Lee.

13. Lee graduated from the University of California, Los Angeles in 2019 and received a Masters in Science from the USC Marshall School of Business in 2021. After graduating, he worked as a Quantitative Trader for approximately one (1) year for a different proprietary trading firm in Chicago before joining Gelber.

14. At Gelber, Lee was part of Grossman's Meld team that worked on improvements to the trading strategies in Meld and exploring opportunities to expand Meld's strategies into new markets, timeframes, or risk profiles. Lee also assisted in configuration management, monitoring of live trading, and reacting to problems or alerts that may arise from both a technical and market standpoint. In order to perform these job duties, Gelber granted Lee with access to Meld's source code.

### *Lee's Agreement with Gelber and Gelber's Protection of its Confidential Information*

15. As a condition of Lee's employment with Gelber, Lee executed a Gelber Employee Non-Compete and Non-Disclosure Agreement ("Agreement"), a true and accurate copy of which is attached hereto as **Exhibit A**.

16. With respect to Gelber's Confidential Information, the Agreement makes clear that: (i) "Gelber has invested significant time and money in developing" its Confidential Information; (ii) Lee "will be afforded special access to Gelber's commercially useful Confidential

Information;" (iii) Lee's "disclosure or use of Gelber's Confidential Information or disclosure to third parties, other than for the sole benefit of Gelber, would cause Gelber great and irreparable harm;" (iv) "Confidential Information is not to be used for any purpose other than in the scope of [Lee's] employment with Gelber, and .. is not to be disclosed to the public or third parties;" (v) Lee "will not disclose such Confidential Information to any company or person without the prior written consent of Gelber;" (v) Lee "will not make any use of such Confidential Information, except to the extent required in order to carry out [Lee's] duties as an employee of Gelber;" and (vi) "[i]n the event that [Lee's] employment with Gelber is terminated for any reason, then [Lee] shall immediately, and in any event no later than one business day after termination, return all the property of Gelber and all Confidential Information[.]" (Agreement, Ex. A at §§ 2.A.1, 2.B.1, and 2.C.).

17. The Agreement defines "Confidential Information" as "information, whether in oral, written, electronic or other form, that (a) is disclosed to [Lee] or of which [Lee] becomes aware as a consequence of or through [Lee's] employment with Gelber, (b) is not generally known outside of Gelber; (c) has value to Gelber; and (d) relates to the business of Gelber, including, *without limitation:*"

4

(a) the Automated Systems and Trading Strategies, in each case including the implementation, testing, amendment, revision, improvement, enhancement and refinement thereof;

(b) computer programs, processes and software source and object codes, trading algorithms or formulae, data and systems and all related documentation and instructional, procedural and training materials related thereto, including all upgrades, updates, improvements, derivatives and modifications thereof and including programs and documentation in incomplete stages of design or research or development;

(c) lists or other compilations of products, instruments and markets traded by Gelber and Gelber's past, present or anticipated market positions;

(d) the existence and terms of Gelber's contractual relationships, including but not limited to those with suppliers, licensors, vendors, joint venturers, computer software and hardware vendors, clearing firms, prime brokers, introducing brokers, exchanges, clearing organizations, investment firms, commodity pool operators, commodity trading advisors, futures commission merchants, market making firms, issuers, distributors, broker/dealers and professional traders;

(e) the terms and basis of Gelber's compensation structure of its employees and contractors;

(f) Gelber's risk and market risk evaluation, assessment and application methods, systems, parameters and thresholds;

(g) lists or other compilations of past, existing or potential employees, members, partners, stockholders or investors;

(h) testing methods and results of Automated Systems and Trading Strategies;

(i) financial information of Gelber including without limitation pricing information, pricing methods, profit and loss information, costs, accounting methods and figures and profit methods and figures;

(j) research and development information in any form or format including such information in incomplete stages of design or research or development;

(k) information concerning communications systems and networks utilized by Gelber, whether owned, licensed or leased;

(l) mailing and contact lists, supplier lists and information concerning present, past or potential licensors, suppliers, customers, methods for developing and maintaining supplier, employee and other business relationships; and

(m) any information which you know, or reasonably ought to know, that Gelber considers to be confidential and proprietary.

(Agreement, Ex. A at § 2.A.1).

18. The Agreement also contains a "Work Made for Hire" provision under which Lee agreed "that all original works of authorship and other work product conceived or made by [Lee] . . . including, without limitation, software object code and source code, are 'works made for hire' such that Gelber will be deemed to be their author and original copyright owner." (Agreement, Ex. A at § 6.A.3).

19. To protect Gelber from irreparable injury, the Agreement expressly entitles Gelber to injunctive relief in the event of a breach or threatened breach of Section 2 of the Agreement pertaining to Confidential Information:

> **4. Remedies for Breach.** Employee agrees that, if Employee were to breach any of the covenants set forth in Sections 2 or 3 above, Gelber would suffer irreparable injury. Employee further agrees that actual damages from any such breach may be difficult to ascertain and, in any event, may be inadequate. Accordingly, Employee agrees that, in the event Employee breaches or threatens to breach any portion of Sections 2 or 3 of this Agreement, Gelber shall be entitled, without posting of a bond, to injunctive relief enjoining or restraining such breach or threatened breach. Nothing herein shall be construed as prohibiting Gelber from pursuing any other remedy available to it for such breach. Employee and Gelber agree that, should Employee breach any provision of Sections 2 or 3 of this Agreement: (i) the period of restriction shall be extended by a period of time equal to that period beginning when such breach occurred and ending when the activities constituting such breach shall have terminated; and (ii) any work product created by Employee, directly or indirectly, in violation of this Agreement shall be destroyed.

(Agreement, Ex. A at § 4).

20. The Agreement further provides that upon a finding of or violation of the Agreement, Lee must pay for attorneys' fees, expert fees, and other costs incurred by Gelber in enforcing the Agreement. (*Id.*).

21. In addition to the Agreement, Gelber maintains a Confidentiality policy in its Employee Handbook. A true and correct copy of the Confidentiality policy is attached hereto as **Exhibit B**.

22. The Confidentiality policy incorporates by reference the definition of "Confidentiality Information" as set forth in the Gelber Employee Non-Compete and Non-Disclosure Agreement and states, "[t]he importance of preserving the confidentiality of such information cannot be overemphasized." (*Id.*).

23. The Employee Handbook is maintained on each employee's Gelber-assigned computer, including the computer assigned to Lee, in a folder entitled "Policies and Procedures." Accordingly, Lee had ready access to the Employee Handbook and its Confidentiality policy.

24. Gelber goes to great efforts to maintain the secrecy of its Confidential Information, including, but not limited to: storing source code in a restricted source code repository known as Git; maintaining trading strategies in a separate trading repository; restricting access to trading strategies to only those working within the relevant trading group; educating traders about the requirements and necessity of keeping this information confidential; restricting access to this information by limiting access to computer networks containing this information to those employees with specific specialties and experience and a need to know the information; requiring the use of passwords to access the information; requiring traders and other employees to execute written agreements protecting against the misuse, improper disclosure, and post-employment retention of Confidential Information, and engaging in post-employment efforts to ensure its Confidential Information is maintained by departing employees in confidence and not shared with competitors.

25. Gelber's Confidential Information is not available to the public, is not shared with the public, and is competitively valuable to competitors of Gelber.

26. Gelber's Confidential Information is the product of years of accumulation and distillation of proprietary information. Gelber has made a considerable investment in terms of hours and expense to accumulate, compile, improve, and maintain this Confidential Information.

*Lee Resigns and Breaches the Agreement*

27. In or around August 2024, Lee moved to Massachusetts, where he continued to work for Gelber. On September 2, 2025, Lee informed Grossman that he was resigning his employment effective that day.

28. Later that day, Maria Kappel, Gelber's Director of Human Resources, sent an e-mail to Lee reminding him of his obligations under the Agreement. A true and correct copy of the

September 2, 2025 e-mail is attached hereto as **Exhibit C**. A copy of the Agreement was attached to the September 2, 2025 e-mail.

29. Also attached to the September 2, 2025 e-mail was a form captioned "Information for Departing Gelber Group Employees_2025." A true and correct copy of the Information for Departing Gelber Group Employees form is attached hereto as **Exhibit D**.

30. The Information for Departing Gelber Group Employees form states, in part:

> **Return of Gelber Equipment and Property**
>
> You are required to return all Gelber equipment upon termination of employment. Please contact infra@gelbergroup.com and/or your manager to address the disposition and return of any Gelber equipment remaining in your possession. Additionally, please work with your manager to ensure the return of any documents/confidential information.

31. Shortly after Lee's resignation, Gelber discovered that Lee had used a messaging platform called Slack to send to himself a large number of files containing the Meld source code and other Gelber Confidential Information relating to Meld on April 28, 2025, July 24, 2025, July 31, 2025, August 1, 2025, August 15, 2025, and August 16, 2025. The source code for Meld downloaded by Lee contained, among other items, Gelber's trade algorithms.

32. In addition to the Meld source code, as Gelber discovered, Lee had taken and downloaded to his personal devices materials containing or reflecting other Gelber Confidential Information, such as research files, reference data, and performance data relative to Meld.

33. Notably, most of the source code and other Confidential Information downloaded by Lee did not relate to the components of Meld on which Lee worked as part of his job duties.

34. The broad scope of Confidential Information taken by Lee, including but not limited to source code for the Meld software product, would enable Lee to reproduce Meld at a competitor of Gelber which, on information and belief, Gelber contends Lee intended, and may still intend, to do.

35. In an apparent effort to hide this misconduct from Gelber, after sending himself Gelber Confidential Information via Slack in April, July and August 2025, Lee attempted to delete those Slack messages from Gelber's system. In the vast majority of those instances, Lee attempted to delete the Slack messages from Gelber's system within seconds or minutes after he had sent them.

36. As a result of Gelber discovering that Lee had used Slack to send himself files containing source code and other Confidential Information relating to Meld, on September 6, 2025, Gelber's counsel, Jeffrey L. Rudd, sent correspondence to Lee regarding Gelber's discovery. A true and correct copy of Mr. Rudd's September 6, 2025 correspondence is attached hereto as **Exhibit E**. In the correspondence, Mr. Rudd requested the following:

> In light of the above, Gelber requires that you provide a written response to this correspondence no later than 5:00 pm CT on Wednesday, September 10, 2025, in which you:
>
> - Confirm that you are willing to work with Gelber to identify all Gelber information and documents that may be in your possession, custody, or control and engage in a cooperative process through which all such information and documents are returned to Gelber or destroyed;
> - Confirm that you will make any electronic devices in your possession, custody, or control and any accounts capable of storing electronic data or information (including, but not limited to, your personal e-mail account) available for forensic review and/or examination to determine if they contain any documents or information belonging to Gelber, including any confidential or trade secret information;
> - Describe each and every instance in which you have disclosed documents or information belonging to Gelber, including any confidential or trade secret information, to any person outside of Gelber or to any entity other than Gelber;
> - Describe each and every instance in which you have used documents or information belonging to Gelber, including any confidential or trade secret information, for any purpose other than the performance of legitimate job duties on behalf of Gelber; and
> - Identify all records, documents, or items in your possession, custody, or control that contain any information belonging to Gelber, including any confidential or trade secret information.

37. On September 8, 2025, Lee's counsel, Raphael B. Hirsch, responded to Mr. Rudd's correspondence. A true and correct copy of Mr. Hirsch's September 8, 2025 correspondence is attached hereto as **Exhibit F**.

9

38. In Mr. Hirsch's correspondence, he represented that Lee was "willing to work with Gelber to identify all Gelber information and documents that might be in his possession, custody, or control and engage in a cooperative process through which all such information and documents are returned to Gelber or destroyed." (*Id.*).

39. Mr. Hirsch further represented that Lee "will make any electronic devices in his possession, custody, or control and any accounts capable of storing electronic data or information . . . available for forensic review and/or examination[.]" (*Id.*).

*Forensic Examination*

40. In accordance with the representations of Mr. Hirsch, Lee provided Gelber's forensic examiner with the following electronic devices: (a) Apple iPhone, (b) LG 16ZOSP/Gram (a laptop), and (c) Dell Precision T1700 (a desktop computer). The devices were produced by Lee on September 29 and October 24, 2025. Gelber separately provided its forensic examiner with: (d) Samsung MZ-V9P1T0 (a hard drive), and (e) SK Hynix (a hard drive).

41. Gelber's forensic examiner conducted an examination of these devices. Through this examination, the forensic examiner confirmed that Gelber's Confidential Information was present on one or more of the devices provided by Lee, including, but not limited to, source code for the Meld software product.

42. In addition, the forensic examiner uncovered evidence of the following:

 a. Lee's iPhone was connected to an Apple computer named "Jacob's MacBook Pro," which was not produced by Lee to Gelber's forensic examiner.

 b. The hard drive in the laptop may have been removed and replaced with a new hard drive, which was not produced by Lee to Gelber's forensic examiner.

    c.   A software produced called "CCleaner" was installed on Lee's laptop in August 2025 and was run several times on September 14, 2025, shortly before Lee's laptop was provided to Gelber's forensic examiner for review. CCleaner can impede forensic examinations and may have been used to delete internet history records from the laptop.

    d.   iCloud had been installed on the laptop but the files that were synced from iCloud had been deleted from the laptop.

    e.   There was evidence of files being downloaded from Slack to the laptop computer.

43.    Based on the forensic examination and internal investigation, Gelber has confirmed that (a) Lee downloaded Confidential Information to his personal electronic devices during his employment and retained that Confidential Information after his employment ended, (b) Lee likely did not produce all electronic devices on which the Confidential Information was or may have been stored, and (c) Lee undertook multiple, continuing efforts to conceal his taking and/or dissemination of Gelber's Confidential Information from Gelber.

44.    Gelber now brings this action for permanent injunctive relief and damages stemming from Lee's breaches of the Agreement and misappropriation of trade secrets.

## CAUSES OF ACTION

### Count I – Breach of Contract

45.    Gelber incorporates by reference the allegations set forth in Paragraphs 1 through 44 as though fully restated herein.

46.    The Agreement is a valid and enforceable contract between Gelber and Lee.

11

47. Despite his contractual obligations, Lee has breached the Agreement by not returning, within one business day of the termination of his employment, all property of Gelber and all Confidential Information. On information and belief, Lee has further breached the Agreement by making use of Confidential Information outside of what was required to carry out his job duties as an employee of Gelber.

48. Lee's breaches relate to material terms of the Agreement.

49. Per the terms of the Agreement, Gelber is entitled to injunctive relief to ensure Lee's compliance with his confidentiality obligations under the Agreement. Upon a finding of a violation of the Agreement, Gelber is further entitled to recover its costs, including attorneys' fees, expert fees, and other costs.

50. As a direct and foreseeable consequence of Lee's actions, Gelber has sustained damages in excess of $75,000, in an amount to be proven at trial, including but not limited to costs and attorneys' fees incurred in enforcing and securing its rights under the Agreement, compensatory damages, and other damages available under the law.

### Count II – Trade Secret Misappropriation Under the DTSA

51. Gelber incorporates by reference the allegations set forth in Paragraphs 1 through 44 as though fully restated herein.

52. Gelber's Confidential Information constitutes trade secrets as defined by the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836 *et seq*. This information is not generally available to Gelber's competitors. It derives independent economic value from not being generally known to other persons who could otherwise obtain economic value from its disclosure or use, and it is the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

53. Gelber's trade secrets relate to trading strategies undertaken, or intended to be undertaken, in interstate commerce and/or globally.

54. The Confidential Information accessed, downloaded, and retained by Lee include trade secrets under the DTSA.

55. Lee committed actual and threatened misappropriation under the DTSA by acquiring and retaining Gelber's Confidential Information through improper means, including in violation of his contractual duty to maintain their secrecy and confidentiality and return it within one (1) day of the termination of his employment.

56. As a result of this misappropriation, Gelber has suffered and will continue to suffer damages for the actual loss caused by Lee's misappropriation of Gelber's trade secrets.

57. Lee's conduct was willful, malicious, and done in conscious disregard of Gelber's rights, entitling Gelber to exemplary damages, attorneys' fees, and costs in an amount to be proven at trial.

58. Pursuant to the DTSA, Gelber is entitled to permanent injunctive relief, enjoining and restraining Lee from further possession, use, or disclosure of its trade secrets.

59. Gelber is entitled to an award of compensatory damages for actual losses caused by the Lee's misappropriation, an award of damages for unjust enrichment obtained by Lee's misappropriation of trade secrets, and an award of exemplary damages, all in amounts to be proven at trial.

**Count III – Trade Secret Misappropriation Under the ITSA**

60. Gelber incorporates by reference the allegations set forth in Paragraphs 1 through 44 as though fully restated herein.

61. Gelber's Confidential Information constitutes trade secrets as defined by the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065, *et seq*. This information is not generally available to Gelber's competitors. It derives independent economic value from not being generally known to other persons who could otherwise obtain economic value from its disclosure or use, and it is the subject of efforts that are reasonable under the circumstances to maintain its confidentiality.

62. The Confidential Information accessed, downloaded, and retained by Lee include trade secrets under the ITSA.

63. Lee committed actual and threatened misappropriation under the ITSA by acquiring and retaining Gelber's Confidential Information through improper means, including in violation of his contractual duty to maintain their secrecy and confidentiality and return it within one (1) day of the termination of his employment.

64. As a result of this misappropriation, Gelber has suffered and will continue to suffer damages for the actual loss caused by Lee's misappropriation of Gelber's trade secrets.

65. Lee's conduct was willful, malicious, and done in conscious disregard of Gelber's rights, entitling Gelber to exemplary damages, attorneys' fees, and costs in an amount to be proven at trial.

66. Pursuant to the ITSA, Gelber is entitled to permanent injunctive relief, enjoining and restraining the Lee from further possession, use, or disclosure of its trade secrets.

67. Gelber is entitled to an award of compensatory damages for actual losses caused by the Lee's misappropriation, an award of damages for unjust enrichment obtained by Lee's misappropriation of trade secrets, and an award of exemplary damages, all in amounts to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Gelber respectfully requests the Court enter judgment in its favor and against Lee, and grant Gelber the following relief:

A. Entry of permanent injunctive relief restraining and prohibiting Lee from possessing, using, or disclosing any Gelber's Confidential Information or trade secrets, and to require the return of the same with independent verification of such return and non-possession;

B. An award of all available monetary damages, including but not limited to lost revenues and profits, compensatory damages, liquidated damages, punitive damages, and other damages available under the law;

C. Disgorgement of any benefits, profits, earnings, or other unjust enrichment improperly obtained by Lee;

D. An award pre- and post-judgment interest;

E. An award of Gelber's reasonable costs and attorneys' fees incurred; and

F. All other relief the Court deems appropriate.

DATED:  December 16, 2025          Respectfully submitted,

                                                            */s/ Jeffrey L. Rudd*
                                                            Jeffrey L. Rudd, ARDC #6273373
                                                            **OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
                                                            155 North Wacker Drive, Suite 4300
                                                            Chicago, Illinois 60606
                                                            Telephone:  312.558.1220
                                                            *jeffrey.rudd@ogletree.com*